IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02300-KAS

JERROD CRAWFORD,

     Plaintiff,

v.

THE NUCLEAR MEDICINE TECHNOLOGY CERTIFICATION BOARD,

     Defendant.

_____

## ORDER

_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on Defendant's **Motion to Dismiss Plaintiff's Amended Complaint** [#51][1] (the "Motion"). Plaintiff, who proceeds as a pro se litigant,[2] filed a Response [#53] in opposition to the Motion [#51], and Defendant filed a Reply [#54]. The Court has reviewed the briefs, the entire case file, and the applicable law. For the following reasons, Defendant's Motion [#51] is **GRANTED**.[3] Plaintiff's First, Second, Third, and Fourth Claims are **DISMISSED WITHOUT PREJUDICE** and his Fifth Claim is **DISMISSED WITH PREJUDICE**.

---

[1] "[#51]" is an example of the convention that the Court uses to identify the docket number assigned to a specific filing by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] The Court must liberally construe the filings of a pro se litigant. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). In doing so, the Court should neither be the pro se litigant's advocate nor "supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1175 (10th Cir. 1997) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).

[3] The parties consented to proceed before the undersigned for all proceedings pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. *See Consent* [#21]; *Order of Reference* [#22].

## I. Background

### A.    Plaintiff's Allegations

Plaintiff Jerrod Crawford is a technologist who practices nuclear medicine and molecular imaging in Colorado. *Am. Compl.* [#48] at 2, ¶ 11. Defendant, The Nuclear Medicine Technology Certification Board, Inc., is one of two certifying agencies in the nuclear medicine and molecular imaging field. *Id.*, ¶ 9. The other is the American Registry of Radiologic Technologists (ARRT), but to qualify for the ARRT certification examination, the technologist must be within 3 years of graduation. *Id.* at 2-3, ¶ 12. Because technologists must hold a certification to gain employment in the nuclear medicine field, this effectively means that Plaintiff must maintain his certification through Defendant. *See id.*, ¶¶ 10-12.

On July 15, 2021, Plaintiff filed an Equal Employment Opportunity Commission (EEOC) complaint against his employer. *Id.* at 3, ¶ 12. One month later, on August 16, 2021, Plaintiff's employer terminated him for an alleged Health Insurance Portability and Accountability Act (HIPAA) policy violation. *Id.*, ¶ 13. On August 30, 2021, following Plaintiff's termination, Plaintiff's previous employer sent an ethics complaint to Defendant. *Id.*, ¶ 16. On November 15, 2021,[4] "after reviewing an email provided by [Plaintiff's] former employer [and Plaintiff's] exhaustive data," Defendant "decided to place [Plaintiff's] professional licenses on probation for a period of 12 months." *Id.* at 4, ¶ 20. On November 23, 2021, Plaintiff notified Defendant that he was appealing its disciplinary decision. *Id.*,

---

[4] Plaintiff states that his 12-month probation began on "15NOV2023," but this appears to be an error. In his original Complaint [#2], which was filed in state court in July 2023, he alleged that his certification was placed "on probation for a twelve (12) months [sic]; beginning November 15, 2021 and concluding on November 15, 2022." *See Am. Compl.* [#48] at 4, ¶ 20; *but see State Court Compl.* [#3] at 4, ¶ 13. The Court presumes Plaintiff meant November 15, 2021.

¶ 22. Plaintiff "submitted evidence of possible retaliation by [his previous employer] in making its frivolous ethics complaint" against him. *Id.*

Defendant decided to revoke Plaintiff's license on February 27, 2022, and on March 17, 2022, Plaintiff contacted Defendant to object to the revocation. *Id.*, ¶ 23; *see also id.* at 19-20, ¶ 51 (quoted statement from Defendant referring to "the revocation decision made by [Defendant] on February 27, 2022"). Defendant responded, warning Plaintiff that evidence he had submitted as part of his appeal included a recording in which "[he] [was] heard using the telephone to call someone (presumably, a pharmacy) while [he] [was] at work to explain that [he] had incorrectly ordered patient doses for the wrong day." *Am. Compl.* [#48] at 4-5, ¶ 24. In the recording, Plaintiff "mention[ed] a patient's name and the imaging scan they [were] scheduled to have performed." *Id.* Defendant explained that "[s]tating and recording private medical information, such as a patient's name and their medical procedure, and distributing such information can be considered disclosure of protected health information." *Id.* In response, Plaintiff contacted Defendant numerous times to discuss various legal considerations (such as Colorado being a one-party recording consent state) which he believed should impact Defendant's disciplinary decision. *See id.*, ¶¶ 25-30.

On or around March 22, 2022, Plaintiff asked Defendant whether he would be able to regain certification through retesting, and Defendant clarified that the revocation of Plaintiff's license was permanent. *See id.* at 5-6, ¶¶ 31-32. Defendant explained that "[t]he reason for revocation of your certifications is due to the fact that your former employer conducted a Human Resources investigation and found cause to terminate your employment for HIPAA violations and noncompliance with their employer policies, as well

as noncompliance to established professional ethics standards[.]" *Id.* at 6, ¶ 32. Plaintiff responded to Defendant with additional legal arguments, challenging the revocation of his license. *See id.*, ¶¶ 33-34. Defendant did not respond to these arguments. *Id.*, ¶ 33.

On March 26, 2023, Plaintiff contacted Defendant's then-Board Director "to further plead his case[.]" *Id.* at 6-7, ¶ 35. On March 28, 2023, Defendant clarified that it had "confirmed the decision to revoke [his] credentials <u>prior</u> to receiving . . . [his] additional audio recordings," including the recording in which he had apparently disclosed a patient's protected health information. *Id.* at 7, ¶¶ 36-37 (emphasis in original). Defendant reiterated that its revocation of Plaintiff's license was "due to the fact that [his] former employer conducted a Human Resources investigation and found cause to terminate [his] employment for . . . <u>HIPAA</u> violations and noncompliance with [his former employer's] policies, as well as noncompliance to [sic] established professional ethics standards and [Defendant's] practice standards[.]" *Id.*, ¶ 37 (emphasis in original).

As a result of these allegations, Plaintiff asserts five claims for relief: (1) breach of contract/bad faith, *id.* at 7-16;[5] (2) "gross material negligence," *id.* at 16-18; (3) fraudulent misrepresentation, *id.* at 18-21; (4) infliction of emotional distress, *id.* at 21-22; and (5) "prima facie tort," *id.* at 22-24. Plaintiff seeks the reinstatement of his certification to practice nuclear medicine technology and a damages award. *See id.* at 15-16, 18, 21, 22, 23-24.

**B.    Procedural Background**

Plaintiff sued Defendant in Colorado state court on July 26, 2023. *See State Court Compl.* [#3]. Defendant removed to this Court on September 8, 2023. *Notice of Removal*

---

[5] Plaintiff restarts paragraph numbering on page 7 of his Amended Complaint [#48]. To avoid confusion, in this Order, the Court cites to page numbers as well as paragraph numbers.

[#1]. Plaintiff filed his operative Amended Complaint [#48] on July 8, 2024, in response to the Court's Minute Order [#47]. On July 22, 2024, Defendant moved to dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6). *See Motion* [#51] at 1.

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Emps.' Ret. Sys. of R.I. v. Williams Cos.,* 889 F.3d 1153, 1161 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* "'[P]lausibility' . . . refer[s] to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Rule 12(b)(6) standard "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Likewise, "a complaint [does not] suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id*. "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to

state a claim for which relief may be granted." *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

### III. Analysis

### A.    First Claim (Breach of Contract/Bad Faith)

Plaintiff alleges that Defendant "maintains an Ethics/Disciplinary Policy between itself and individuals holding NMTCB Certificate [sic], such as [Plaintiff]." *Am. Compl.* [#48] at 7, ¶ 4.[6] He contends that this Policy "constitutes a contract between [Plaintiff] and [Defendant]" and that Defendant has breached it by inadequately investigating his employer's ethics complaint. *Id.* at 8, ¶ 5; *id.* at 7-16.

Under Colorado law, a breach of contract claim contains four elements: "(1) the existence of a contract, (2) the plaintiff's performance of the contract or justification for nonperformance, (3) the defendant's failure to perform the contract, and (4) the plaintiff's damages as a result of the defendant's failure to perform the contract." *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024). "The first step in establishing the existence of a contract is a showing that a contract was properly formed." *W. Maui Props., LLC v. Deutsche Bank Tr. Co. Ams.*, No. 16-cv-01646-LTB-KLM, 2016 WL 10518587, at *2 (D. Colo. Dec. 22, 2016). "[F]ormation of a contract requires mutual assent to the terms of the contract and legal consideration for which the parties bargained." *See Univ. of Denver*,

---

[6] He also alleges that "[Defendant] maintains an accreditation from the NCCA [National Commission for Certifying Agencies], and the NCCA has an Ethics/Disciplinary Policy between the two of them." *Am. Compl.* [#48] at 7, ¶ 2. To the extent that Plaintiff alleges Defendant is in breach of its own contract with NCCA, he does not explain how he has standing to enforce a contract to which he is not a party. *See, e.g.*, *Forest City Stapleton Inc. v. Rogers*, 393 P.3d 487, 490 (Colo. 2017) (explaining the principle of "privity of contract," which "requires that one must be a party to the contract to enforce a term in the contract or an implied warranty arising out of the contract").

547 P.3d at 1139 (citing *Pierce v. St. Vrain Valley Sch. Dist. RE-1J*, 981 P.2d 600, 603 (Colo. 1999); *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008)). An organization's policy is not necessarily a contract. *See, e.g.*, *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987) (in the context of employment policies, rejecting both "the categorical rule that an employee manual automatically becomes part of the employment contract and that an employee can be terminated only in accordance with its terms" and "the contrary rule that such manuals are no more than unilateral expressions of general policies which have no bearing on the employee's contractual rights").

The existence of a contract must be plausibly alleged. *See, e.g.*, *Shell v. Am. Fam. Rights Ass'n*, 899 F. Supp. 2d 1035, 1059 (D. Colo. 2012) (dismissing breach of contract claim where "there [were] no facts alleged that plausibly suggest the existence of a contract"); *W. Maui Props.*, 2016 WL 10518587, at *2-3 (finding that plaintiff had not plausibly alleged the existence of a contract where it did not plausibly allege the tender of an offer or an acceptance of an offer). Thus, the Court need not accept as true Plaintiff's conclusory allegation that a contract exists in the form of the Ethics/Disciplinary Policy. *See S. Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1262 (10th Cir. 1998) (stating that the court "need not accept [plaintiff's] conclusory allegations as true"); *see also Motion* [#51] at 5 (arguing that "[t]he mere fact of the existence of the Ethics/Disciplinary Policy is not sufficient to establish a legally binding contract"). Defendant argues that "the Amended Complaint contains no factual allegations whatsoever plausibly establishing the elements of offer, acceptance, and exchange of consideration[.]" *Motion* [#51] at 5. The Court agrees.

Plaintiff has plausibly alleged that *a policy* exists, but not that a *contract* exists—he has not alleged that he and Defendant mutually assented to the Ethics/Disciplinary Policy's terms or that any legal consideration was bargained for or exchanged. *Cf. Univ. of Denver*, 547 P.3d at 1139. At most, the Policy is a general statement about how Defendant aspires and intends to resolve ethical and disciplinary complaints—for example, it will "make a reasonable effort to determine the facts of the matter and negotiate a resolution" and "it takes ethical responsibility" to ensure that frivolous complaints are not filed.[7] *Am. Compl.* [#48] at 9-10, ¶ 15, 17. Because Plaintiff has not plausibly alleged that the Ethics/Disciplinary Policy is a contract, he has failed to state a breach of contract claim. Accordingly, Plaintiff's First Claim is **dismissed without prejudice**. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (stating that "ordinarily the dismissal of a pro se claim under Rule 12(b)(6) should be without prejudice").

---

[7] At other times, Plaintiff frames his claim in the language of implied contract or promissory estoppel, i.e., that Defendant broke various enforceable promises. *See Am. Compl.* [#48] at 8-10, ¶¶ 12-18. Under Colorado law, an enforceable promise has two requirements: (1) it must be a "clear and unambiguous" "manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made"; and (2) it must be "sufficiently definite to allow a court to understand the nature of the obligation." *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 703-04 (Colo. App. 2010) (citations and internal quotation marks omitted). Again, however, statements that merely describe or detail an entity's policies are not enforceable promises. *See, e.g.*, *Kerstien v. McGraw-Hill Cos.*, 7 F. App'x 868, 873 (10th Cir. 2001) ("[A] statement that is merely a description of policy does not constitute a promise or commitment by an employer."); *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1199 (Colo. App. 1997) (finding that employer's disciplinary procedure policy was "not a promise nor a commitment by the employer" in part because the promise of "fair and equitable standards" was insufficiently definite to create an enforceable obligation). Here, Plaintiff has not plausibly alleged facts from which the Court could reasonably infer that the Ethics/Disciplinary Policy constitutes an enforceable promise. Instead, he cites aspirational statements from the Policy that are insufficiently definite to create enforceable obligations. *Cf. George*, 950 P.2d at 1199.

**B.    Second Claim ("Gross Material Negligence")**

Plaintiff's Second Claim is titled "gross material negligence." *Am. Compl.* [#48] at 16. Plaintiff argues that if Defendant "had followed the clear and unambiguous FEDERAL and STATE legislation concerning HIPAA . . . It would have fulfilled its function and responsibility to meeting legislative intent in conducting its quasi-judicial role." *Id.* at 16, ¶ 37. Plaintiff then argues that Defendant's failure to take certain actions during its investigation was unreasonable. *See id.* at 17, ¶ 41 (arguing that "a reasonable quasi-judicial board should have seen the need to revisit its ruling on the Plaintiffs [sic] case; if not to outright suspend the judgment in its entirety"); ¶ 43 ("The Defendant should have reasonably done a simple internet search to ascertain the validity of any Law related to the complaint, and not simply take it at face value; as was done here."). Defendant argues for dismissal of this claim because Plaintiff "fails to allege the standard under which any alleged legal duty arises." *Motion* [#51] at 10.

Although Colorado does not recognize a legal theory called "gross material negligence," the Court must liberally construe Plaintiff's claims, "despite [his] failure to cite proper legal authority, his confusion of various legal theories . . . [and] his unfamiliarity with pleading requirements." *Hall*, 935 F.2d at 1110; *see also Haines*, 404 U.S. at 520-21. Thus, the Court considers whether Plaintiff's Second Claim potentially asserts a claim of simple negligence, gross negligence, or negligence per se based on alleged HIPAA violations.

**1.    Common Law Negligence (Simple or Gross)**

In Colorado, to establish a claim of common law negligence, a plaintiff must demonstrate the following elements: "'(1) the existence of a legal duty to the plaintiff; (2)

the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach of duty caused the injury.'" *Dolin v. Contemp. Fin. Sols., Inc.*, 622 F. Supp. 2d 1077, 1082 (D. Colo. 2009) (quoting *Raleigh v. Performance Plumbing and Heating, Inc.*, 130 P.3d 1011, 1015 (Colo. 2006)). "A negligence claim will fail if it is rooted in circumstances for which the law imposes no duty of care upon the defendant." *Univ. of Denver*, 547 P.3d at 1145 (internal quotation marks and citation omitted). The common law tort of gross negligence, on the other hand, requires an additional showing that the defendant engaged in willful and wanton conduct. *See, e.g.*, *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 954 (Colo. App. 2011); *Forman v. Brown*, 944 P.2d 559, 564 (Colo. App. 1996). Gross negligence is "'action committed recklessly, with conscious disregard for the safety of others.'" *Gilbert v. U.S. Olympic Comm.*, 423 F. Supp. 3d 1112, 1149 (D. Colo. 2019) (quoting *Hamill*, 262 P.2d at 954).

Here, to the extent that Plaintiff's claim involves Defendant's alleged failure to revisit or suspend its disciplinary action against Plaintiff, or to conduct "a simple internet search to ascertain the validity of any Law related to the complaint," he is asserting a failure to act, or nonfeasance. *See Am. Compl.* [#48] at 17, ¶¶ 41, 43. "[I]n a nonfeasance case, the existence of a duty has been recognized primarily in cases involving a limited group of special relationships between the parties." *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287, 295 (Colo. 2020). The Colorado Supreme Court has recognized only six categories of "special relationships": "(1) common carrier/passenger; (2) innkeeper/guest; (3) possessor of land/invited entrant; (4) employer/employee; (5) parent/child; and (6) hospital/patient." *Id.* Where no such "special relationship" exists, courts decline to impose a duty of care in nonfeasance cases. *Id.* Because licensure

through a private licensing board does not implicate any of these relationships, Plaintiff has not plausibly alleged that Defendant owed him a legal duty of care to act.

To the extent Plaintiff attempts to allege that Defendant engaged in misfeasance, i.e., conduct that "created a new risk of harm to [him]," rather than nonfeasance, the Court notes that the only specific legal duties he identifies in his Amended Complaint [#48] are drawn from HIPAA, a federal statute. *Cf. Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 296 (Colo. App. 2009) (explaining the distinction between misfeasance and nonfeasance in Colorado); *see also, e.g.*, *Am. Compl.* [#48] at 16-18, ¶¶ 38, 41-42, 44, 45 (invoking HIPAA and its related privacy rule as setting duties Defendant allegedly breached). The Court discusses Plaintiff's potential statutory negligence claim below, but he has not plausibly alleged that Defendant acted in breach of a *common law* duty of care.

Because Plaintiff has not plausibly alleged that Defendant owed him a common law duty of care, he has not plausibly alleged either a simple or gross negligence claim. *See, e.g.*, *Richardson v. DHS Drilling Co.*, No. 13-cv-01583-PAB-KMT, 2015 WL 1378975, at *8 (D. Colo. Mar. 24, 2015) (granting summary judgment for the defendant on negligence and gross negligence claims where the plaintiff failed to show that a common law duty of care existed) (citing *Casey v. Christie Lodge Owners Ass'n, Inc.*, 923 P.2d 365, 368 (Colo. App. 1996) (affirming summary judgment for the defendant on negligence and gross negligence claims where the defendant owed no common law duty of care to the plaintiff); *Weil v. First Nat'l Bank of Castle Rock*, 983 P.2d 812, 814-15 (Colo. App. 1999) (affirming summary judgment against the plaintiff on claims of

negligence and gross negligence where the defendant did not owe him a legal duty under the circumstances)).

### 2.    Statutory Negligence (Negligence Per Se)

Plaintiff also alleges that Defendant owes a legal duty to "follow[] the clear and unambiguous FEDERAL and STATE legislation concerning HIPAA" and HIPAA's "Privacy Rule" *Am. Compl.* [#48] at 16-17, ¶¶ 37, 42. He suggests that Defendant had an independent and statutory legal duty to suspend discipline and to investigate whether Plaintiff's previous employer had properly trained Plaintiff on HIPAA laws. *Id.* at 16-18, ¶¶ 39-45. He argues that had Defendant done so, the resulting findings would have "exonerate[d] the Plaintiff and ma[de] it unlawful to exact punitive action against the Plaintiff." *Id.* at 17, ¶ 44.

A legislative enactment, such as HIPAA, may establish a defendant's legal duty of care. *See, e.g., Davenport v. Cmty. Corr. of Pikes Peak Region, Inc.*, 962 P.2d 963, 966-67 (Colo. 1998) (analyzing whether Colo. Rev. Stat. § 17-27-101 established a duty of care in the context of community corrections). "[A] duty of care is established where the plaintiff is a member of the class the statute was designed to protect, and where the injury suffered is the type of injury which the statute was enacted to prevent." *Id.* at 966.

Congress enacted HIPAA, 42 U.S.C. §§ 1320d through d-8, "to address concerns about the confidentiality of individually identifiable health information, particularly in an era of electronic communication." *Prot. & Advoc. Sys., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1216 (D. Wyo. 2006). To that end, the Department of Health and Human Services promulgated the Privacy Rule, 45 C.F.R. § 160.103, to protect "all individually identifiable health information held or transmitted by a covered entity or its business

associate in any form or media." *Id.* Broadly, HIPAA requires health plans, health care clearinghouses, and health care providers to "maintain reasonable and appropriate administrative, technical, and physical safeguards" "to ensure the integrity and confidentiality of the [patient's] information[.]" 42 U.S.C. § 1320d-2(d)(2)(A). At every turn, HIPAA is concerned with protecting *patients'* protected health information—not with protecting *providers. See, e.g.*, *Univ. of Colo. Hosp. Auth. v. Denver Publ'g Co.*, 340 F. Supp. 2d 1142, 1144 (D. Colo. 2004) (finding that HIPAA does not create a private cause of action because it does not "contain[] any language conferring privacy rights upon, or identifying as the intended beneficiary . . . any specific class of persons (*particularly one which would include healthcare providers* such as [the plaintiff])") (emphasis added).[8]

Here, Plaintiff simply is not a member of the group of persons HIPAA is intended to protect—he is a provider, not a patient—and his employment-related injuries, such as "diminution of earning power in the field of nuclear medicine due to the loss of his Certification," simply are not the types of injuries that HIPAA was intended to protect against. *See Am. Compl.* [#48] at 18, ¶ G; *see, e.g.*, *Davenport*, 962 P.2d at 967 (declining to impose statute-based duty of care on the defendant where the relevant statute "offer[ed] no indication that . . . the General Assembly sought to prevent injuries such as [the plaintiff's]"). Neither HIPAA nor its related Privacy Rule impose a relevant legal duty on Defendant, and Plaintiff does not plausibly allege that Defendant owed him any other duty of care.

---

[8] Even though HIPAA does not create a private cause of action, "it may still define the scope of duty that serves as the basis for a negligence per se claim." *Charlie v. Rehoboth McKinley Christian Health Care Servs.*, 598 F. Supp. 3d 1145, 1158 (D.N.M. 2022).

Based on the foregoing, Plaintiff has not plausibly alleged a claim for simple or gross negligence, or negligence per se. Accordingly, his Second Claim is **dismissed without prejudice**. *See Gee*, 627 F.3d at 1186.

## C.   Third Claim (Fraudulent Misrepresentation)

A fraudulent misrepresentation claim has four elements: (1) "a knowing misrepresentation of material fact"; (2) "reliance on the material misrepresentation"; (3) "the right or justification in relying on the misrepresentation"; and (4) "reliance resulting in damages." *Clark v. Green Tree Servicing, LLC*, 69 F. Supp. 3d 1203, 1223 (D. Colo. 2014) (quoting *Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App. 2003)) (internal quotation marks omitted). Reliance is typically shown "where a party alters his or her position as a consequence of another's conduct." *Marquardt*, 200 P.3d at 1129 (citation omitted). Thus, a plaintiff must plausibly allege that he reasonably relied on the defendant's false statements *to his detriment*—that is, that his reliance caused a worsening of his position. *See Soneff v. Harlan*, 712 P.2d 1084, 1086 (Colo. App. 1985) (describing detrimental reliance as "one of the elements necessary to establish fraud"); *accord Reliance*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "detrimental reliance" as "reliance by one party on the acts or representations of another, causing a worsening of the first party's position"). Defendants argue that Plaintiff has shown neither reliance on Defendant's statements nor detriment. *See Motion* [#51] at 11 (arguing that the Amended Complaint [#48] "contains no allegations as to how Plaintiff relied on the identified statements in any way or how he was damaged by reliance on those statements").

Plaintiff points to six "reasons" Defendant supposedly offered as the basis for revoking his license, and he contends that this created a "moving target" as he sought to

defend himself. *See Am. Compl.* [#48] at 19-20, ¶¶ 48-54. These six reasons boil down to two: (1) his "former employer conducted a Human Resources investigation and found cause to terminate [his] employment for HIPAA Violations and noncompliance with policies"; and (2) "supplemental materials [submitted as part of Plaintiff's appeal] contained additional and substantial evidence of his misconduct, including non-compliance with applicable law causing [Defendant] to revoke his credentials[.]" *Id.*, ¶¶ 49, 52. Plaintiff complains that Defendant's various reasons created a "moving target" while he sought to defend  himself. *Id.* at 20, ¶ 54. Plaintiff claims that the "moving target" cost him "time spent advocating for his actions in regards to transmission of Protected Health Information" as captured in "lawfully recorded conversations," only to have Defendant later tell him that it had decided to revoke his credentials *prior to* its receipt of those recordings. *See id.* at 21, ¶ 58; *see also id.* at 7, ¶¶ 36-37.

Even liberally construing his allegations, Plaintiff fails to plausibly allege reliance or detriment. First, other allegations in Plaintiff's Amended Complaint [#48] contradict any suggestion that Plaintiff was misled into focusing on the recording as he pursued his appeal. On the contrary, he continued to attack both the recording and his former employer's investigation and its ethics complaint. *See, e.g.*, *id.* at 4, ¶ 22 (alleging that Plaintiff "submitted evidence of possible retaliation by [his former employer] in making its frivolous ethics complaint"). Thus, he has not plausibly alleged that he altered his conduct or his theory of appeal in any way based on Defendant's proffered reasons. *Cf. Marquardt*, 200 P.3d at 1129. He does not allege that he was limited or barred from advancing any arguments because he chose to address the recorded conversations. In fact, he continued to raise legal arguments and attack the decision on all fronts even a year after

revocation. *See, e.g.*, *Am. Compl.* [#48] at 6, ¶ 35 (alleging that Plaintiff reached out to Defendant's then-Board Director on March 26, 2023, "to further plead his case").

Second, all six "reasons" which Plaintiff claims he relied upon were communicated to him *after* Defendant had already revoked his license. *Compare id.* at 19-20, ¶ 51 (quoted statement from Defendant referring to "the revocation decision made by [Defendant] on February 27, 2022") *with id.*, ¶¶ 48-53 (earliest of the six "reasons" was communicated to Plaintiff on February 28, 2022). Even if the Court assumes Plaintiff relied on these "reasons," his license was already revoked; therefore, any reliance could not have plausibly worsened his position in any way. In conclusory fashion, Plaintiff vaguely asserts that Defendant "invoke[d] additional discipline" after his revocation, on March 22, 2022, when it informed him that he could not reinstate his credentials through testing, but the Court cannot reasonably infer that this constituted additional discipline. *Am. Compl.* [#48] at 5-6, ¶¶ 31-32; *see Iqbal*, 556 U.S. at 678 (explaining that a plaintiff must plead "factual content that enables the court to draw [] reasonable inference[s]"). As Plaintiff acknowledges, Defendant was merely responding to Plaintiff's clarifying question, i.e. whether he would be able to reinstate his certification through testing. *See Am. Compl.* [#48] at 6, ¶¶ 31-32. In sum, Plaintiff has not shown detrimental reliance on Defendant's six "reasons" because he has not plausibly alleged a worsening of his situation at that point.

Plaintiff has failed to state a fraudulent misrepresentation claim. Therefore, his Third Claim is **dismissed without prejudice**. *See Gee*, 627 F.3d at 1186.

**D.      Fourth Claim (Inflction of Emotional Distress)**

Colorado recognizes two categories of the tort of inflection of emotional distress: (1) negligent infliction of emotional distress (NIED) and (2) intentional infliction of emotional distress (IIED). *See, e.g.*, *English v. Griffin*, 99 P.3d 90, 93, 95 (Colo. App. 2004) (separately discussing the plaintiffs' IIED and NIED claims). Here, Plaintiff broadly alleges that Defendant caused him "extreme emotional damage intentionally caused [sic] and negligently deprived [him] of his property" through various actions connected to its investigation and revocation of his license. *See Am. Compl.* [#48] at 21-22, ¶ 60. Because Plaintiff invokes both negligence and intentional conduct, the Court considers both potential claims.

**1.      Negligent Infliction of Emotional Distress**

Under Colorado law, a claim of negligent infliction of emotional distress must be "predicated upon a viable claim that the defendant negligently violated a legal duty of care owed to the plaintiff." *English*, 99 P.3d at 95 (citing *Slovek v. Bd. of Cnty. Comm'rs*, 697 P.2d 781, 783 (Colo. App. 1984), *aff'd* 723 P.2d 1309 (Colo. 1986)). Here, because the Court finds that Plaintiff has failed to plausibly allege that Defendant owed him a legal duty of care, any claim for negligent infliction of emotional distress must also fail. *See English*, 99 P.3d at 95 (finding that dismissal of NIED claim was appropriate "because [the] defendant owed the decedent no legal duty upon which a negligence claim could be based") (citing *Biel v. Alcott*, 876 P.2d 60, 63 (Colo. App. 1993) (affirming dismissal of NIED claim after concluding that the defendant "owed no duty to plaintiff" for purposes of negligence claim)).

### 2.    Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress, Plaintiff must plausibly allege three elements: (1) Defendant "engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing . . . [P]laintiff severe emotional distress, and (3) caus[ed] . . . [P]laintiff severe emotional distress." *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (quoting *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002)).

To satisfy the first element, a defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994) (internal quotation marks and citation omitted). "Although the jury ultimately determines whether conduct is outrageous, a court must first determine if reasonable persons could differ on the question." *Han Ye Lee v. Colo. Times, Inc.*, 222 P.3d 957, 963 (Colo. App. 2009) (citing *Culpepper*, 877 P.2d at 883). Outrageous conduct generally exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Rugg v. McCarty*, 476 P.2d 753, 756 (Colo. 1970).

The bar for having an outrageous conduct claim submitted to a jury is extremely high. *See, e.g., Han Ye Lee*, 222 P.3d at 963-64 (finding error in trial court's grant of summary judgment where the defendant newspaper allegedly impugned a widow's integrity and loyalty to her late husband, whose murder she had witnessed, by recklessly and falsely publishing that she had been absent from the suspect's murder trial, causing

the suspect be found innocent); *Roget v. Grand Pontiac, Inc.*, 5 P.3d 341, 346 (Colo. App. 1999) (affirming submission of issue to jury where the defendant car dealer's agent allegedly strong-armed plaintiffs during negotiations, committed fraudulent acts, falsified documents, and "refused to give [the plaintiff] the keys to his car when he requested them"); *Montgomery Ward & Co. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987) (finding no error in submission of claim to a jury where the counterclaim defendant allegedly changed the locks and cleared everything, including personal belongings, from the store where the counterclaimant business owner had operated for years, all while the counterclaimant was out of town); *Danyew v. Phelps*, 676 P.2d 707, 709 (Colo. App. 1983) (affirming submission of issue to jury where the defendant landlord allegedly evicted a hospitalized tenant without notice).

Here, Plaintiff's apparent unhappiness with the quality of Defendant's investigation and its outcome does not rise to the level of outrageous conduct. Plaintiff acknowledges that Defendant began investigating him after it received an ethics complaint from his previous employer. *See Am. Compl.* [#48] at 3, ¶ 16. After reviewing information from both Plaintiff and his previous employer, Defendant suspended Plaintiff's license for 12 months before eventually revoking it. *See id.* at 4, ¶ 20; *id.* at 6, ¶ 32. Defendant stated that its revocation was based on Plaintiff's previous employer's grounds for termination. *See id.* at 7, ¶ 37. In the outrageous conduct context, the proper question is not whether Defendant's investigation was well designed, or even whether it was *adequate*. Instead, the proper question is whether Plaintiff has alleged facts which could lead a reasonable juror to label Defendant's conduct "so outrageous in character, and so extreme in degree,

as to go beyond all possible bounds of decency[.]" *Culpepper*, 877 P.2d at 882. He has not.

Plaintiff has failed to plausibly state a claim for either negligent infliction of emotional distress or intentional infliction of emotional distress. Therefore, his Fourth Claim is **dismissed without prejudice**. *See Gee*, 627 F.3d at 1186.

**E.     Fifth Claim ("Prima Facie Tort")**

Plaintiff's Fifth and final Claim is for "prima facie tort." *Am. Compl.* [#48] at 22-24. He takes issue with Defendant's statement wishing him "good luck in your future career endeavors" while revoking his license. *Id.* at 23, ¶ 62. Plaintiff argues that "[t]his added bit of commentary speaks to the unjust and personal manner in which the Plaintiff's actions were judged by," and, although "[t]he defendant's conduct was otherwise lawful," there was "no legitimate excuse or justification for [the] conduct." *See id.*, ¶¶ 62-66.

Defendant argues that "[t]here is no such cause of action for 'tort,' generally, and the allegations in this section seem to vaguely concern conduct Plaintiff has found unfair and insulting, but state no actual legal theory under which Plaintiff could recover for the alleged slights." *Motion* [#51] at 13. Plaintiff does not address this point or expand on his Fifth Claim in his Response [#53].

Although the Court must hold Plaintiff's pleadings to a "less stringent standard than formal pleadings drafted by lawyers," that "does not relieve [Plaintiff] of the burden of alleging sufficient facts on which a recognized legal claim could be based." *See Hall*, 935 F.2d at 1110. Even liberally construed, the Court cannot discern the legal nature of his "prima facie tort" claim and it cannot "construct a legal theory on a plaintiff's behalf." *Whitney*, 113 F.3d at 1175. Plaintiff's "prima facie tort" claim is based on no identifiable

or legally cognizable theory. Accordingly, Plaintiff's Fifth Claim is **dismissed with prejudice**. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

## F.    Discovery

Finally, the Court briefly addresses Plaintiff's request "to move this case forward to, or past the discovery stage" because he "feels very confident . . . [that] the Defense is very clear about what the Plaintiff is bringing to bare [sic] as evidence in this case," and he is "interested in seeing anything that the Defendant would like to provide in discovery." *Response* [#53] at 5. However, Plaintiff has it backward: he is not entitled to discovery until and unless he has plausibly stated claims upon which relief can be granted. *See Iqbal*, 556 U.S. at 678-79 (stating that "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"); *Khan v. White*, 35 F. App'x 849, 850 (10th Cir. 2002) (affirming dismissal of pro se plaintiff's complaint and rejecting his argument "that discovery would have permitted him to learn facts to substantiate some of his claims"). As previously discussed, Plaintiff has failed to state any plausible claims, so he is not entitled to discovery.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that Defendant's Motion to Dismiss Plaintiff's Amended Complaint [#51] is **GRANTED**.

IT IS FURTHER **ORDERED** that Plaintiff's First, Second, Third, and Fourth Claims are **DISMISSED WITHOUT PREJUDICE**, and Plaintiffs Fifth Claim is **DISMISSED WITH**

**PREJUDICE**, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state claims on which relief may be granted.

IT IS FURTHER **ORDERED** that all other pending Motions [#50, #55, #56, #61] are **DENIED AS MOOT**.

IT IS FURTHER **ORDERED** that the Clerk of Court is directed to close this case.


Dated: March 23, 2025                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge